**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSE MILTON BAUTISTA ESCAMILLA,

    Plaintiff,

      v.

DAVID NUYEN, *et al.*,

    Defendants.

Civil Action No. 14-0852 (AK)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case involves the Federal Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. §§ 201 *et seq.*, and the D.C. Minimum Wage Act Revision Act of 1992 ("DCMWA"), D.C. Code §§ 32–1001 *et seq.* On December 18, 2014, this matter was assigned to the undersigned for all purposes and trial. (Order of Referral [11]; December 18, 2014 Minute Order.) On October 25, 2016, the Court concluded a two-day bench trial. Following the bench trial, and as instructed by the Court, the parties submitted their proposed Findings of Fact and Conclusions of Law. (*See* Plaintiff's Proposed Findings of Fact and Law [40] ("Pl.'s Findings"); Findings of Fact and Conclusions of Law; F.R.C.P. Rule 52(a) [41] ("Def.'s Findings").) The Court now makes its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1). Any facts not expressly stated in the below findings are either immaterial or undisputed. For the reasons set forth herein, and after considering parties' submissions, witness testimony, and evidence presented at trial, the Court finds the plaintiff is entitled to his unpaid overtime wages pursuant to the FLSA and the DCMWA. The Court, therefore, enters judgment in favor of the plaintiff.

# I. <u>BACKGROUND</u>

Jose Milton Bautista Escamilla ("Plaintiff" or "Mr. Escamilla") brings this suit against David Nuyen d/b/a USA Home Champion Realty and d/b/a Opmax ("Mr. Nuyen), USA Home Champion Realty, Inc. ("HCR"), Opmax Management, LLC ("OM"), and Opmax, LLC ("Opmax") (collectively, "Defendants"). Plaintiff worked for Defendants from approximately March 1, 2008 through about January 28, 2013. (Plaintiff's Pretrial Statement [33] ("Pl.'s PTS") at 1; Trial Tr. [37], 17:11-16.) For the entire duration of Plaintiff's employment, Mr. Nuyen served as president and primary owner of Opmax, OM, HCR, and the rental properties that Defendants operate in Washington, D.C. (Complaint [1] ("Compl.") ¶¶ 6, 10; *see also* Trial Tr. [37], 18:15-24; Trial Tr. [38], 5:25, 6:1-4.)

Mr. Nuyen's building manager, Sung Dang ("Mr. Dang"), recommended Plaintiff speak with Mr. Nuyen about a job. (Trial Tr. [37], 19:2-16.) After speaking with Plaintiff, Mr. Nuyen subsequently hired Plaintiff to perform maintenance work on Mr. Nuyen's rental properties in Washington, D.C. (Trial Tr. [37], 19:2-21.) While employed as a "general laborer," Plaintiff cleaned, painted, and repaired Defendants' apartment buildings, as well as completed plumbing and carpentry tasks (Pl.'s PTS at 2; *see also* Defendant's Pretrial Statement [34] ("Def.'s PTS") at 2.)

On May 22, 2014, Plaintiff brought suit against Defendants, alleging that, during the course of his employment with Defendants, Mr. Nuyen denied Plaintiff overtime compensation in violation of the FLSA and DCMWA. (Compl. ¶¶ 2, 44–56.) Specifically, Plaintiff claims he worked approximately 66 hours per week during his 253 weeks of employment with Defendants and was only paid $10.00 per hour rather than receiving his "half time" premium of $5.00 for every hour worked beyond a 40-hour workweek. (Compl. ¶¶ 28–31; Pl.'s PTS at 1–2; Trial Tr.

[37], 20:1-20.)  Plaintiff thus argues that Defendants owe him unpaid overtime wages, totaling $20,670.00. (Pl.'s Findings 3, 10, 20.)  In addition to overtime wages, Plaintiff maintains that he is entitled to liquidated damages, equitable tolling of his claims, and reasonable attorney's fees pursuant to both the FLSA and the DCMWA. (Compl. ¶¶ 38–40, 43; Pl.'s Findings 16–19.)

Defendants deny Plaintiff's claims and argue that Plaintiff was hired as an independent contractor who was paid per job rather than per hour. (Def.'s PTS at 1–3.)  Moreover, Defendants claim that Plaintiff signed a contract, on February 1, 2012, agreeing that Mr. Nuyen does not control Plaintiff's hours and that Plaintiff may rely on his own skills and training while working for Defendants. (*See* Def.'s PTS at 1.)

The undersigned conducted a two-day bench trial on October 24, 2016 and October 25, 2016.  Plaintiff testified and also called former coworkers Cesar Gaytan Rodriguez and Melbin Javier Ochoa to testify.  Defendants subsequently called Mr. Dang to testify.  After considering witness testimony, evidence presented, and the parties' proposed Findings of Fact and Conclusions of Law, the undersigned finds that Plaintiff met his burden of proof in showing that Defendants violated FLSA and DCMWA for their failure to pay Plaintiff his overtime wages.

## II. <u>FINDINGS OF FACT</u>

### A.  <u>Duration of Plaintiff's Employment</u>

1.      Mr. Dang told Plaintiff to meet with Mr. Nuyen about a job. (Trial Tr. [37], 19:2-16.)  Mr. Nuyen subsequently hired Plaintiff. (Trial Tr. [37], 19:17-21.)

2.      Plaintiff worked for Defendants from approximately March 1, 2008 through about January 28, 2013. (Trial Tr. [37], 17:11-16, 27:14-20; Trial Tr. [38], 16:5-7, 82:1-18.)

3.      Throughout Plaintiff's employment with Defendants, Plaintiff only worked for Defendants and not for any other employer. (Trial Tr. [37], 27:14-23, 28:2-4, 67:19-25, 78:20-25, 79:1-4, 87:6-8; Trial Tr. [38], 16:16-19.)  Plaintiff did not advertise or market himself to others about the services or work he could do. (Trial Tr. [37], 27:24-25, 28:1-4, 87:9-11; Trial Tr. [38], 16:13-15.)

4.      During his employment with Defendants, Plaintiff never took an extended vacation from work. (Trial Tr. [38], 17:1-10.)

**B.  Plaintiff's Work Duties**

5.      The type of work Plaintiff performed for Defendants was building maintenance. (Trial Tr. [37], 18:12-14.)  As a general laborer, Plaintiff performed cleaning, painting, plumbing, and carpentry tasks and repairs in Defendants' apartment buildings. (Trial Tr. [37], 18:12-24, 31:16-23; Trial Tr. [38], 43:19-22.)

6.      Plaintiff did not have any advanced degrees or certifications. (Trial Tr. [37], 27:7-9.)  An advanced degree or certification was not required for the type of work Plaintiff was performing. (Trial Tr. [37], 27:10-13.)  Plaintiff was a low-skilled worker. (Trial Tr. [37], 6:8-10, 12:10-13, 27:7-9, 31:4-8; Trial Tr. [38], 15:23-25, 25:15-17.)

7.      Plaintiff's coworkers included Cesar Gaytan Rodriguez and Melbin Javier Ochoa, who performed various duties alongside Plaintiff. (Trial Tr. [37], 17:17-23, 18:6-11, 77:17-19, 78:1-7, 78:11-14, 78:20-23; Trial Tr. [38], 5:9-11, 22:12-20.)

**C.  Plaintiff's Work Schedule**

8.      Each week, Plaintiff worked Monday through Saturday. (Trial Tr. [37], 24:18-20.) Plaintiff also sometimes worked on Sundays. (Trial Tr. [37], 24:18-25, 98:23-25, 99:6-8; Trial Tr. [38], 9:8-12.)

4

9.      Mr. Nuyen determined the hours Plaintiff worked. (Trial Tr. [37], 82:20-25; Trial Tr. [38], 13:10-15.)  Mr. Nuyen would tell Plaintiff when he was able to leave work for the day. (Trial Tr. [37], 23:8-14.)

10.     Plaintiff would begin work at around 8 a.m. and work until 7 p.m., taking a 30- or 45-minute break for lunch. (Trial Tr. [37], 20:21-25, 23:3-7, 23:8-17, 62:1-8, 62:24-25, 63:1-2, 68:10-12, 80:21-23, 81:2-5; Trial Tr. [38], 7:13-25, 8:1-6, 31:6-7.)

11.     Plaintiff was not required to "clock in" or "clock out" of work each day. (Trial Tr. [37], 21:16-22, 23:22-24; Trial Tr. [38], 29:7-17.)

12.     Plaintiff sometimes worked later than 7 p.m. (Trial Tr. [37], 68:10-19; Trial Tr. [38], 8:7-19.)  If there was an emergency, Plaintiff would finish work later than 7 p.m. (Trial Tr. [37], 23:18-21, 81:10-16; Trial Tr. [38], 9:13-25, 10:1-2, 32:4-9.)  Plaintiff was available at any time of the day for an emergency repair. (Trial Tr. [37], 69:14-18.)

13.     The fewest hours Plaintiff worked per week was 60 hours and the most hours Plaintiff worked per week was 70 hours. (Trial Tr. [37], 46:5-16, 61:24-25, 62:1-25. 63:1-2.)

**D.  Plaintiff's Payment Method, Rate, and Schedule**

14.     Defendants consistently paid Plaintiff $10.00 per hour. (Trial Tr. [37], 20:1-20, 25:4-6, 26:8-10, 79:7-17, 80:2-16, 84:22-25, 85:1-5, 88:11-16; Trial Tr. [38] 6:5-7, 13:4-6.)  Mr. Nuyen is the person who decided to pay Plaintiff $10.00 per hour. (Trial Tr. [37], 25:4-9, 83:17-21; Trial Tr. [38], 13:16-21.)  Mr. Nuyen also made the payments. (Trial Tr. [38], 23:17-21, 48:15-18.)

15.     Plaintiff was paid per hour rather than per task. (Trial Tr. [38], 12:23-25.)

16.     Each day, Plaintiff would inform Defendants about the number of hours he worked that day. (Trial Tr. [37], 38:10-14.)  Mr. Nuyen and Mr. Dang would write down the hours Plaintiff and his coworkers reported. (Trial Tr. [37], 96:7-20.)

17.     Mr. Dang's report does not constitute a business record under the hearsay exception. (Trial Tr. [38], 50:14-25, 51:1-25, 52:1-25, 57:5-25, 58:1-25, 66:11-24, 67:18-25, 68:1-25, 69:12-20, 70:23-25, 71:1-11, 79:1-12, 89:20-25, 90:1-25.)

18.     Mr. Nuyen decided to pay Plaintiff by check. (Trial Tr. [37], 25:10-14, 83:22-25, 84:1-4; Trial Tr. [38], 14:2-5, 62:22-25.)

19.     Defendants paid Plaintiff every two weeks. (Trial Tr. [37], 28:14-15.)  At the beginning of Plaintiff's employment, Defendants paid him every week, but it later became every two weeks. (Trial Tr. [37], 28:14-25, 29:1-3, 63:3-8.)  Defendants never paid Plaintiff early or late. (Trial Tr. [37], 28:20-23.)

20.     Plaintiff never received a raise throughout his employment with Defendants. (Trial Tr. [37], 20:8-10, 80:11-16; Trial Tr. [38], 6:21-23.)

21.     The only way Plaintiff could make more money was by working more hours. (Trial Tr. [37], 26:14-17, 85:6-14; Trial Tr. [38], 15:7-10.)  Mr. Nuyen and Mr. Dang controlled whether Plaintiff could work additional hours. (Trial Tr. [37], 26:14-22, 85:15-25.)

22.     For any hours Plaintiff worked over the regular 40-hour workweek, Defendants paid $10.00 for every hour. (Trial Tr. [37], 20:1-20, 79:7-17.)

**E.  Work Conditions**

23.     When Plaintiff would arrive each day, Mr. Nuyen would call Mr. Dang and inform him of Plaintiff's assignments. (Trial Tr. [37], 21:1-8, 37:14-19, 83:4-9.)

24.     Mr. Nuyen and Mr. Dang would inspect Plaintiff's work before Mr. Nuyen assigned Plaintiff his next task. (Trial Tr. [37], 21:23-25, 22:1-5, 25:15-24, 81:17-25, 82:1-5; Trial Tr. [38], 10:10-25.)

25.     Mr. Nuyen and Mr. Dang would instruct Plaintiff on how to complete each assignment. (Trial Tr. [37], 22:6-10, 25:25, 26:1-7, 84:9-21; Trial Tr. [38], 11:1-11.)

26.     Mr. Nuyen determined Plaintiff's daily schedule. (Trial Tr. [37], 25:1-3.)

27.     Mr. Nuyen was often at the properties where Plaintiff was working. (Trial Tr. [37], 37:20-25.)  He would be there four to five times per week, including on Sundays. (Trial Tr. [37], 38:1-3.)

28.     Mr. Nuyen had the authority to fire Plaintiff and his coworkers if they did not follow Mr. Nuyen's orders. (Trial Tr. [37], 86:11-19.)

**F.  Defendants' Job Sites**

29.     Mr. Nuyen was the owner of the apartment buildings where Plaintiff and his coworkers performed their work assignments. (Trial Tr. [38], 5:25, 6:1-4.)  Mr. Dang was the building manager. (Trial Tr. [37], 19:9-13.)

30.     Defendants' gross revenue was over $500,000. (Trial Tr. [38], 38:8-19.)

31.     Plaintiff worked on four different buildings for Mr. Nuyen and Mr. Dang. (Trial Tr. [37], 36:10-16, 76:7-8.)  Each building had about 30 units, so there were about 120 units in total. (Trial Tr. [37], 76:2-14.)

32.     Defendants provided the tools. (Trial Tr. [37], 82:12-19, 93:8-19; Trial Tr. [38], 11:12-20, 28:3-18, 82:25, 83:1-5.)  Each of Defendants' apartment buildings had a tool shop with an assortment of tools. (Trial Tr. [37], 21:9-15, 24:3-12, 39:2-13.)

33.     Mr. Dang would go to Home Depot in the District of Columbia and in Maryland to purchase tools with Mr. Nuyen's credit card when Defendants ran out of tools or when certain tools were needed for a work assignment. (Trial Tr. [37], 24:9-17; Trial Tr. [38], 11:12-25, 12:1-16.)

34.     Plaintiff and his coworkers had to be at the buildings when supervisors or city inspectors would arrive to come and see the work. (Trial Tr. [37], 37:3-6.)

**G.   Plaintiff's Knowledge of Overtime Compensation**

35.     Plaintiff did not see any posters or notices about federal or District of Columbia laws, workplace safety regulations, or overtime laws at Defendants' buildings. (Trial Tr. [37], 29:8-16.)  Mr. Nuyen has admitted that there were no posters regarding these subjects. (Trial Tr. [38], 38:21-25, 40:1-12.)

36.     Mr. Nuyen never informed Plaintiff about overtime compensation. (Trial Tr. [37], 29:23-25.)  He told Plaintiff that Plaintiff did not have a right to overtime wages. (Trial Tr. [37], 30:1-3.)  Plaintiff believed Mr. Nuyen. (Trial Tr. [37], 30:4-5.)

37.     Plaintiff became aware that he was entitled to overtime compensation after meeting with his attorneys. (Trial Tr. [37], 30:6-8.)

**H.  The Service Agreement**

38.     Plaintiff signed what Defendants refer to as a service agreement dated February 1, 2012. (Trial Tr. [37], 51:1-6.)

39.     Plaintiff had filed a complaint prior to signing the service agreement. (Trial Tr. [37], 73:3-7.)

40.     Defendants told Plaintiff that if Plaintiff withdrew his lawsuit, Defendants would give Plaintiff his job back. (Trial Tr. [37], 51:7-11, 67:14-18, 73:3-7.)  Defendants also told

Plaintiff that if he did not sign the contract, Defendants would not give him any work. (Trial Tr. [37], 71:7-10.)  When Plaintiff withdrew his lawsuit, Defendants did not give him any work. (Trial Tr. [37], 51:7-11, 71:15-22, 72:10-14, 73:3-7, 75:14-15.)  Mr. Dang was aware that Plaintiff withdrew his complaint. (Trial Tr. [38], 83:17-21.)

41.     The service agreement states that Mr. Nuyen is not Plaintiff's employer. (Trial Tr. [37], 52:1-5.)

42.     Plaintiff was not able to read the service agreement. (Trial Tr. [37], 52:1-10, 67:9-11, 71:2-6.)  Plaintiff did not have the opportunity to negotiate the contract with Defendants. (Trial Tr. [37], 67:3-5.)  Plaintiff also did not have the opportunity to provide any feedback as to what provisions should be included in the contract. (Trial Tr. [37], 67:6-8.)

43.     Plaintiff signed the agreement because he wanted his job. (Trial Tr. [37], 67:12-18.)

## III. <u>STANDARD OF REVIEW</u>

Pursuant to Federal Rule of Civil Procedure 52, "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1).  When presenting the findings of fact, "the court need not address every factual contention and argumentative detail raised by the parties, [n]or discuss all evidence presented at trial." *Yah Kai World Wide Enterprises, Inc. v, Napper*, No. 11-CV-2174 (KBJ), 2016 WL 3647840, at *3 (D.D.C. July 3, 2016) (quoting *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015) (internal quotation marks and citations omitted)).  Rather, it is only necessary that the court "make brief, definite, pertinent findings and conclusions upon the contested matters" in a way that is "sufficient to allow the appellate court to conduct a meaningful review."

*Wise v. United States*, 145 F. Supp. 3d 53, 57 (D.D.C. 2015) (quoting Fed. R. Civ. P. 52(a)

advisory committee's note to 1946 amendment; *Caffey v. Togo*, No. 97–5092, 1998 WL 230269,

at *2 (D.C. Cir. Feb. 9, 1998)).  Further, the findings of fact, "whether based on oral or other

evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due

regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P.

52(a)(6).

Additionally, the plaintiff's requisite burden of proof in most civil trials is "by a

preponderance of the evidence." *See Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.,* 885 F.

Supp. 2d 156, 181 (D.D.C. 2012).  The preponderance of the evidence standard is where "the

fact-finder believe[s] that the existence of a fact is more probable than the non-existence of that

fact." *Ascom*, 885 F. Supp. 2d at 181 (quoting *United States v. Smith*, 267 F.3d 1154, 1161 (D.C.

Cir. 2001)).

## IV. <u>CONCLUSIONS OF LAW</u>

Along with the findings of fact, the Court now enters the conclusions of law.

Specifically, the Court addresses Plaintiff's arguments that Defendants were employers and

Plaintiff was an employee during the time Plaintiff was employed. The Court also discusses

Plaintiff's claims for unpaid overtime compensation under the FLSA and DCMWA, liquidated

damages, equitable tolling, and reasonable attorney's fees.

### A. <u>Mr. Nuyen and Corporate Defendants as Employers</u>

### 1. <u>Legal Standard</u>

In order for a defendant to be liable under the FLSA, the defendant must be considered an

"employer." 29 U.S.C. §§ 206–207.   An "employer" is "any person acting directly or indirectly

in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  Courts broadly

construe this statutory definition to ensure the remedial purposes of the FLSA. *Morrison v. Int'l*

*Programs Consortium, Inc.*, 253 F.3d 5, 10 (D.C. Cir. 2001).

A corporate officer may be classified as an employer under the FLSA "if the officer has

operational control of a corporation's covered enterprise." *Ventura v. Bebo Foods, Inc.*, 738 F.

Supp. 2d 1, 5 (D.D.C. 2010).  In determining whether a corporate officer has operational control,

the Court uses an "economic reality" test.  *See Ventura*, 738 F. Supp. 2d at 5 (citing *Morrison*,

253 F.3d at 11).

When applying the economic reality test, the Court "considers the totality of the

circumstances of the relationship between the plaintiff/employee and defendant/employer to

determine whether the putative employer has the power to hire and fire, supervise and control

work schedules or conditions of employment, determine rate and method of pay, and maintain

employment records." *Ventura*, 738 F. Supp. 2d at 5 (internal quotation marks and citations

omitted).  The economic reality test may show that multiple employers are liable for violations of

the FLSA. *Id*.

Moreover, the FLSA may also apply to enterprises.  An enterprise subject to the FLSA is

one with "employees engaged in commerce or in the production of goods for commerce, or that

has employees handling, selling, or otherwise working on goods or materials that have been

moved in or produced for commerce by any person." 29 U.S.C. § 203(s)(1)(A)(i).  The enterprise

must also have an "annual gross volume of sales made or business done" that is at least

$500,000, "exclusive of excise taxes at the retail level that are separately stated." 29 U.S.C. §

203(s)(1)(A)(ii).

Additionally, under the DCMWA, the term "employer" includes "any individual, partnership, general contractor, subcontractor, association, corporation, business trust, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee . . . " D.C. Code § 32–1002(3).[1]

## 2. **Analysis**

Mr. Nuyen was Plaintiff's employer under the FLSA and the DCMWA for his ability to hire and fire Plaintiff; control Plaintiff's work schedule; determine Plaintiff's rate, method, and schedule of payment; and maintain employment records.

First, it was ultimately Mr. Nuyen who hired and fired Plaintiff. (Trial Tr. [37], 17:14-25, 18:1-5, 19:2-21.)  Second, Mr. Nuyen routinely set Plaintiff's work schedule. (Trial Tr. [37], 82:20-25; Trial Tr. [38], 13:10-15.)  Third, Mr. Nuyen decided to pay Plaintiff $10.00 per hour and was responsible for making the actual payments by check. (Trial Tr. [37], 25:4-14, 83:17-25, 84:1-4; Trial Tr. [38], 13:16-21, 23:17-21, 48:15-18.)  As for the payment schedule, Mr. Nuyen decided to pay Plaintiff every two weeks, except for the time period when he decided to pay Plaintiff weekly. (Trial Tr. [37], 28:14-25, 29:1-3, 63:3-8.)  Moreover, Mr. Nuyen never gave Plaintiff a raise, and the only way Plaintiff could earn more money was if Mr. Nuyen decided to give Plaintiff additional hours of work. (Trial Tr. [37], 20:8-10, 26:14-25, 27:1-6, 80:11-16, 85:6-14; Trial Tr. [38], 6:21-23, 15:7-22.)  Finally, regarding the ability to maintain employment records, the undersigned is uncertain as to whether Mr. Nuyen kept any records or whether Mr. Dang held that responsibility. (*See* Trial Tr. [37], 96:4-20.)

---

[1] Regarding employers' liability, the DCMWA is "construed consistently with the FLSA." *Thompson v. Linda And A., Inc.*, 779 F. Supp. 2d 139, 146 (D.D.C. 2011) (citing *Ventura*, 738 F. Supp. 2d at 5 n.2; *Del Villar v. Flynn Architectural Finishes*, 664 F. Supp. 2d 94, 96 (D.D.C. 2009); D.C. Code § 32–1002 (defining "employer" and "employee")).

Still, in considering these factors in relation to the totality of the circumstances, the undersigned finds that Mr. Nuyen was a corporate officer who had a sufficient amount of operational control of the corporate defendants and authority over Plaintiff to qualify as an employer under the FLSA and the DCMWA.

The corporate defendants in this case—HCR, OM, and Opmax—are also subject to the FLSA and DCMWA.  It is undisputed that these corporate defendants had annual gross revenue that equaled at least $500,000. (Trial Tr. [38], 38:8-19.)  Further, the corporate defendants were an enterprise that engaged in commerce. *See* 29 U.S.C. § 203(s)(1)(A)(i).  Defendants purchased tools and materials that came from areas outside of Washington, D.C. (Trial Tr. [37], 24:9-14; Trial Tr. [38], 11:12-25, 12:1-16.)  Moreover, Plaintiff and his coworkers used those tools to work on Defendants' rental properties. (Trial Tr. [37], 21:9-15, 24:3-12, 39:2-13, 82:12-19, 93:8-19; Trial Tr. [38], 11:12-20, 28:2-18, 82:25, 83:1-5.)

Accordingly, the undersigned finds that Defendants—Mr. Nuyen and the corporate defendants—were Plaintiff's employers and are thus jointly and severally liable for overtime wage violations under the FLSA and the DCMWA.

**B.  Mr. Escamilla as Employee**

**1.  Legal Standard**

Under the FLSA, an "employee" is defined as "any individual employed by an employer," with "employ" meaning to "suffer or permit to work." 29 U.S.C. §§ 203(e)(1), 203(g).  Similar to the definition of "employer," the definition of "employee" is broad in order to abide by the remedial purposes of the FLSA. *Morrison*, 253 F.3d at 10.  To analyze an individual's employment status under the statute, courts apply an "economic reality" test, which includes several factors: (1) "the degree of control exercised by the employer over the workers,"

13

(2) "the workers' opportunity for profit or loss and their investment in the business," (3) "the degree of skill and independent initiative required to perform the work," (4) "the permanence or duration of the working relationship," and (5) "the extent to which the work is an integral part of the employer's business." *Thompson v. Linda And A., Inc.*, 779 F. Supp. 2d 139, 147 (D.D.C. 2011) (quoting *Morrison*, 253 F.3d at 11).

None of these factors alone are dispositive. *Morrison*, 253 F.3d at 11.  Rather, courts should "look at the totality of the circumstances and consider any relevant evidence." *Id.*  The "final and determinative question" is whether an examination of the totality of the circumstances "establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit." *Id.* (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976)).

## 2. <u>Analysis</u>

To determine whether Plaintiff should be classified as an employee under the FLSA and the DCMWA, the undersigned applies the facts the Court has taken to be true to the economic reality test.  Each of the five factors are addressed in turn.[2]

---

[2] During the first day of the bench trial, on October 24, 2016, Defendants introduced a purported service agreement between Mr. Nuyen and Plaintiff. (*See* Defendant's Exhibit A; *see also* Trial Tr. [37], 56:10-14.)  Defendants introduced the service agreement to show that Plaintiff agreed to his status as an independent contractor rather than an employee. (Trial Tr. [37], 51:1-25, 52:1-25, 54:10-25, 55:1-23.)  However, the Court finds this service agreement to be invalid due to the possibility that Plaintiff was coerced into signing the agreement.  The Court finds that Plaintiff had filed a complaint prior to Defendants presenting Plaintiff with the agreement and that Defendants told Plaintiff that if Plaintiff withdrew the lawsuit, he could get his job back. (Trial Tr. [37], 51:7-11, 67:14-18, 73:3-7.)  Additionally, if Plaintiff did not sign the contract, Defendants would not assign him any work. (Trial Tr. [37]. 71:7-10.)  Further, Defendants did not give Plaintiff time to read the agreement or negotiate the terms. (Trial Tr. [37], 52:1-10, 67:3-5, 67:9-11.)  Plaintiff admits that he signed the contract because he wanted his job. (Trial Tr. [37], 67:12-18.)  Given that these are the conditions under which Plaintiff signed the agreement, the Court will not take Defendant's Exhibit A into account when determining Plaintiff's status as an employee.

### a. *Degree of Control*

The first factor involves the amount of control Defendants exercised over Plaintiff in terms of the manner in which Plaintiff performed his duties.  Plaintiff argues that Defendants had "abundant control" over Plaintiff and his coworkers. (Trial Tr. [37], 5:3-11, 55:17-20.)

Plaintiff provides several examples to illustrate its claim regarding Defendants' exercise of control.  For instance, Defendants always set Plaintiff's daily work schedule. (Trial Tr. [37], 23:8-24, 25:1-3, 26:14-22, 82:20-25.)  Defendants also controlled Plaintiff's rate and method of payment. (Trial Tr. [37], 25:4-14, 83:10-21; Trial Tr. [38], 12:23-25, 13:1-23, 14:2-5.) Moreover, Defendants provided Plaintiff with all the necessary tools and materials needed on site to complete the work. (Trial Tr. [37], 21:9-15, 24:3-12, 82:12-19, 93:8-19; Trial Tr. [38], 11:12-20.)  Finally, Mr. Nuyen was often at the properties where Plaintiff was working, sometimes as much as four to five times per week, including on Sundays. (Trial Tr. [37], 37:20-25, 38:1-3.)

Additionally, before Plaintiff could proceed to his next task, Defendants had to review and sign off on all of Plaintiff's work. (Trial Tr. [37], 22:1-5, 25:15-24, 81:24-25, 82:1-5; Trial Tr. [38], 10:10-25.)  Defendants also decided which tasks Plaintiff would perform and the way in which Plaintiff would perform them. (Trial Tr. [37], 22:6-10, 25:25, 26:1-7, 82:6-11, 84:9-21; Trial Tr. [38], 11:1-11.)  In fact, Defendants would even decide which paintbrush Plaintiff should use to paint a wall. (Trial Tr. [37], 5:8-10.)  During his testimony, Plaintiff stated, "I would do my work, but I couldn't do it my way.  It would have to be their way." (Trial Tr. [37], 22:18-25.)

Defendants refute Plaintiff's claims regarding the degree of control Defendants exercised over Plaintiff.  Defendants argue that Plaintiff was not supervised. (Trial Tr. [37], 12:14-17.) Instead, once Defendants assigned projects to Plaintiff, he "worked at his own pace." *Id*. However, in weighing witnesses' credibility and the evidence presented, the undersigned finds it

15

hard to believe that Plaintiff was able to determine his own work schedule and decide how to complete tasks.

Due to the apparent control Defendants consistently exercised over Plaintiff and his work performance, the undersigned finds that this factor strongly weighs in favor of Plaintiff's status as an employee rather than as an independent contractor.

### b. *Opportunities for Profit or Loss and Investment in the Business*

The second factor involves Plaintiff's opportunity for profit or loss, as well as investment in Defendants' business.  The compensation Plaintiff received from working for Defendants was entirely dependent on the payment rate, method, and schedule that Defendants set. (Trial Tr. [37], 25:4-14, 26:8-13, 83:10-21, 84:22-25, 85:1-25; Trial Tr. [38], 12:23-25, 13:1-25, 14:1-5.) Defendants therefore solely controlled Plaintiff's opportunity for profit or loss.  Further, since Defendants controlled Plaintiff's work schedule and the number of hours he worked each day, only Defendants could decide to add more hours to Plaintiff's schedule, thereby giving him the opportunity to earn additional wages. (Trial Tr. [37], 26:14-25, 27:1-6, 85:15-20; Trial Tr. [38], 14:16-25, 15:1-22.)

As for Plaintiff's opportunity to invest in the business, it is clear that Plaintiff has made little, if any, investment.  Defendants provided all of the materials and tools for Plaintiff and his coworkers to complete tasks, so Plaintiff was not investing in his own tools to perform the work. (Trial Tr. [37], 5:18-23, 82:12-19, 93:8-19; Trial Tr. [38], 11:12-20, 28:3-18, 82:25, 83:1-5.)  In fact, Mr. Dang testified that the "[m]aterials are already there" and that Mr. Dang would "supplement" if any tools were missing. (Trial Tr. [38], 83:3-5.)  Plaintiff would visit the tool shop inside Defendants' buildings to get tools. (Trial Tr. [37], 21:9-15, 39:2-13.)

Defendants counter Plaintiff's contention and argue that Plaintiff brought his own tools to the job site. (Trial Tr. [37], 13:1-4.)  Defendants do, however, state that Plaintiff did not bring his own paintbrushes when painting, but that it was because paint brushes were used and then thrown away at the end of the assignment. (Trial Tr. [37], 13:5-7.)  Despite Defendants' witness testimony, it appears that even if Plaintiff did bring one or two tools, of which the undersigned is not necessarily convinced, this factor alone would not determine Plaintiff's status.

Thus, as with the degree of control, this factor weighs in favor of employee status due to the lack of opportunities Plaintiff had for profit or loss, as well as regarding investment in the business.

### c. *Degree of Skill and Independent Initiative Required*

Plaintiff was employed as a general laborer in which he cleaned, painted, and repaired Defendants' apartment buildings, among other tasks.  (Trial Tr. [37], 6:6-10, 18:12-24.) Moreover, Plaintiff testified that he did not have a higher degree of education or any specialized certifications for his skills while employed as a general laborer. (Trial Tr. [37], 6:8-10, 27:7-13, 31:4-8, 86:20-22; Trial Tr. [38], 15:23-25.)  In fact, Defendants agree with Plaintiff that he was not trained for his work and that he came in as a "low-skilled worker." (Trial Tr. [37], 12:10-13.)[3]

The undersigned therefore concludes that the lack of specialized skills required for a general laborer also weigh in favor of Plaintiff's status as an employee.

---

[3] Following Defendants' concession, Defendants argue that even though Plaintiff was a low-skilled worker, it does not mean that he is thus classified as an employee.  (Trial Tr. [37], 12:10-20.)  Still, the undersigned finds Defendants' concession helps this factor weigh more heavily in favor of Plaintiff being classified as an employee.

### d. *Permanence or Duration of the Working Relationship*

As for permanence or duration of the working relationship, the "more permanent the relationship, the more likely it is that a court will find a worker to be an employee." *Thompson*, 779 F. Supp. 2d at 150.   In this case, Plaintiff was employed for about five years, working full time and regularly working over 40 hours per week. (Trial Tr. [37], 17:11-16, 23:10-21, 28:2-13, 80:21-23, 81:1-16; Trial Tr. [38], 7:13-25, 8:1-19.)   He regularly worked six or seven days a week for Defendants, and he could not come and go to a job site as he pleased. (Trial Tr. [37], 6:13-19, 24:18-25; Trial Tr. [38], 8:20-25, 9:1-12.)   Instead, Plaintiff had a time by when he had to be at work, and he could not leave for the day until Defendants believed he had finished his tasks. (Trial Tr. [37], 6:13-19, 21:23-25, 22:1-5, 25:15-24.)

Further, Plaintiff testified that he did not perform work for any other employer while he worked for Defendants, nor did he attempt to find work for any other employer during this time. (Trial Tr. [37], 6:20-23, 27:21-25, 28:1-4, 40:8-10, 43:2-3, 43:12-23, 78:20-25, 79:1-4, 87:1-18; Trial Tr. [38], 16:8-19, 17:1-3.)

Accordingly, as with the previous factors, this piece of the analysis weighs in favor of Plaintiff's status as an employee.

### e. *Integral Part of the Employer's Business*

The final factor is whether Plaintiff's work was an integral part of the business.   In this case, it is clear to the undersigned that Plaintiff's work was in fact an integral part of Defendants' business. Without Plaintiff and his coworkers performing maintenance and repairs to Defendants' apartment buildings, "the apartment buildings could not stay open and function." (Trial Tr. [37], 7:11-14.)   Through Plaintiff's work, Plaintiff helped ensure that Defendants' apartment buildings were in compliance with codes and regulations. (*Id.*)

Therefore, this factor weighs heavily in favor of Plaintiff's status as an employee.  After considering all of the factors of the economic reality test, the undersigned finds that Plaintiff was Defendants' employee, and not an independent contractor, under the FLSA and the DCMWA.

## C.  Overtime Compensation

### 1.  Legal Standard

Pursuant to the FLSA and the DCMWA, employers are required to pay employees "one and one-half times" their regular rate of pay for the time employees work in excess of forty hours per week for any given workweek. 29 U.S.C. § 207(a)(1).[4]  As stated above, the FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee" and defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(d)–(e)(1).

Under the FLSA, a plaintiff's ability to bring a claim is subject to a two-year statute of limitations, unless the plaintiff can show that the defendant willfully violated the statute.  29 U.S.C. § 255(a).  If the plaintiff can show that the employer committed a "willful violation," the statute of limitations is three years. *Id*.  A willful violation is one where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

Moreover, the FLSA and its regulations require employers to "record the dates of the workweek, the regular hourly rate, the hours worked each day, the weekly total, the 'straight-time' wages paid, and the overtime paid to each employee." *Guevara v. Ischia, Inc.*, 47 F. Supp.

---

[4] The DCMWA's overtime requirement is almost identical to the overtime requirement included in the FLSA. *See Williams v. W.M.A. Transit Co.*, 472 F.2d 1258, 1260–61 (D.C. Cir. 1972).  Therefore, the Court finds that liability under the FLSA for overtime wages automatically triggers the overtime violation under the DCMWA.

3d 23, 28 (D.D.C. 2014) (citing 29 U.S.C. § 211(c); 29 C.F.R. § 516.2(a)(5–9); D.C. Code 32–

1008.)  An employer who does not maintain sufficient records will not hinder a plaintiff in

bringing a claim against the employer. *See Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 52–53

(D.D.C. 2006) (holding that "where the employer's time records are inaccurate or incomplete . . .

[t]he fact that the employee's evidence is merely an approximation is not a bar to recovery").

### 2.  **Analysis**

Given that Defendants were employers and Plaintiff was an employee, Plaintiff was

entitled to overtime compensation for any hours he worked over the 40-hour workweek.  Yet,

Defendants never paid Plaintiff one and one-half times his regular rate for the additional hours he

worked.  Instead, for the entire time Plaintiff was employed, Defendants paid Plaintiff his regular

rate of $10.00 per hour, including for any hours over a 40-hour workweek. (Trial Tr. [37], 20:14-

20, 79:7-17; Trial Tr. [38], 6:5-25, 7:1-4.)  Plaintiff consistently worked more than 40 hours per

week while he was employed. (Trial Tr. [37], 23:10-21, 24:18-25, 80:21-25, 81:1-5; Trial Tr.

[38], 7:13-25, 8:1-19, 9:8-12, 9:22-25, 10:1-2.)  Specifically, Plaintiff worked about 66 hours per

week, or 26 additional hours over the average 40-hour workweek. (Trial Tr. [37], 20:24-25,

23:10-21, 24:18-25, 80:21-23; Trial Tr. [38], 7:13-25, 8:1-25, 9:1-25, 10:1-2.)  Although Plaintiff

made several requests for his overtime wages, Defendants denied Plaintiff any overtime wages.

(Trial Tr. [37], 30:1-5.)

Defendants refute Plaintiff's claims and maintain that Plaintiff worked "variable hours,

not nine to five and not two weekend days." (Trial Tr. [37], 13:8-15.)  Moreover, he worked "at

his own pace" and "when he wanted to work." *Id*.  In terms of payment, Defendants argue that

Plaintiff was paid different amounts, not $10.00 per hour. (Trial Tr. [37], 13:16-23.)  The

undersigned finds Defendants' arguments unconvincing, especially since the undersigned believes Plaintiff was an employee, rather than an independent contractor, while employed.

As for the limitations period, Plaintiff is entitled to a three-year statute of limitations due to Defendants' willful violation of the FLSA. Defendants did not consult with legal counsel when they denied Plaintiff his overtime wages. (Trial Tr. [37], 10:12-16; Trial Tr. [38], 37:3-25, 38:1.) They did not testify or present evidence showing they reviewed the FLSA or its regulations when determining what Plaintiff was entitled to receive. The Court believes Defendants may have ignored the appropriate laws and, instead, called Plaintiff an independent contractor. This, the Court believes, makes for a willful violation and thus extends the limitations period to three years. *See Ayala v. Tito Contractors, Inc.*, 82 F. Supp. 3d 279, 286 (D.D.C. 2015).

Further, Defendants did not maintain sufficient employment records as required by the FLSA and its regulations. During the bench trial, Defendants introduced as evidence Mr. Dang's purported payment records to show that Plaintiff was paid varying amounts each payment period. (*See* Defendant's Exhibit B.) Plaintiff objected, arguing these are not "business records" and are therefore inadmissible. (Trial Tr. [38], 50:22-25, 51:1-4, 51:22-25, 52:1-3.)

A document is considered a "business record," and therefore an exception to the hearsay rule, if: (1) "the record was made at or near the time by—or from information transmitted by—someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a business . . ."; (3) "making the record was a regular practice of that activity"; (4) "all these conditions are shown by the testimony of the custodian or another qualified witness . . ."; and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6).

21

However, the undersigned does not believe these payment records fall within the "business records" exception and are thus inadmissible.[5]  It is not clear whether Mr. Dang did in fact create the records contemporaneously to the time of payment. (Trial Tr. [38], 53:2-23, 54:1-8, 58:8-12, 66:1-24, 68:13-20.)  Moreover, Mr. Dang testified that his records were incomplete. (Trial Tr. [38], 59:19-24, 70:23-25, 71:1-25, 74:4-11, 79:1-12.)  He further testified that these were his personal records rather than business records because he was "not an accountant." (Trial Tr. [38], 58:13-25, 68:4-12.)

Additionally, Defendants did not require Plaintiff to "clock in" and "clock out" each day, which could have provided a more exact record. (Trial Tr. [37], 21:16-22, 23:22-24; Trial Tr. [38], 29:7-17.)  Therefore, Defendants lack any sort of sufficient employment records providing the information the FLSA requires.

Defendants thus violated the overtime wage provisions under the FLSA and the DCMWA by failing to pay Plaintiff one and one-half times his regular rate of pay for the hours he worked over a 40-hour workweek.  Accordingly, Plaintiff is entitled to his unpaid overtime compensation in the amount of $20,280.00.[6]

---

[5] In Plaintiff's Proposed Findings of Fact and Law, Plaintiff refers to a different case, *Melbin Javier Ochoa, et al., v. David Nuyen, et al.*, No. 1:12-cv-02072-RJL-DAR, in which the magistrate judge finds the same employment records from the same Defendants inadmissible. (Pl.'s Findings 13–14.) Plaintiff requests the undersigned to defer to the magistrate judge's Report and Recommendation and argues that "[i]t would be inappropriate for the Court to give Defendants a second bite at the apple in this matter." (*Id.*)  However, the Report and Recommendation is not binding until the trial court decides whether to adopt it. *See* Local Rule 72.3(c).  As of this filing date, the trial court has not ruled on whether to adopt the Report and Recommendation.

[6] The Court calculated this amount in the following manner: Applying the three-year statute of limitations, Plaintiff's claim runs 156 weeks.  The Court takes as fact that Plaintiff worked, on average, 66 hours per week.  Further, Plaintiff was owed his "half time" premium of $5.00 for every hour worked beyond the 40-hour workweek. Therefore, the Court multiplies $5.00 by 26 hours per week, which equals $130.00 per week. The Court then multiplies $130.00 by 156 weeks, which equals $20,280.00.  It is not clear to the Court how Plaintiff calculated unpaid overtime compensation in the amount of $20,670.00. (*See* Pl.'s Findings 3, 10, 20.)

**D.  Liquidated Damages**

**1.  Legal Standard**

Pursuant to the FLSA and the DCMWA, an employer who has violated the requirement for overtime compensation "shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  Moreover, a court must award liquidated damages, unless the employer shows, through evidence satisfactory to the court, that the act or omission giving rise to such action was in good faith and not a violation of the FLSA.  29 U.S.C. § 260; *see also Beale v. Dist. of Columbia*, 789 F.Supp. 1172, 1178 (D.D.C. 1992).  The "standard for liquidated damages under the FLSA and the DCMWA is quite plaintiff-friendly." *Guevara*, 47 F. Supp. 3d at 29.

After all, an employer's defense against an award of liquidated damages requires "an affirmative showing of a genuine attempt to ascertain what the law requires, not simply the absence of subjective bad faith." *Thompson*, 779 F. Supp. 2d at 153 (quoting *Danesh v. Rite Aid Corp.*, 39 F. Supp. 2d 7, 13, (D.D.C. 1999)) (internal quotation marks omitted).  The defense requires more than just evidence of subjective good faith. *See Thomas v. Howard Univ. Hosp.*, 39 F.3d 370, 373 (D.C. Cir. 1994) (holding that "[l]iability for liquidated damages follows, unless the employer has a certain kind of excuse—a reasonable belief that its acts or omissions did not violate the law").

Moreover, the purpose of a court awarding liquidated damages under the FLSA is intended to "compensate employees for delay in receiving their lawful compensation;" it is not meant to punish employers. *Beale*, 789 F.Supp. at 1178.

2. <u>**Analysis**</u>

Defendants have not provided evidence satisfactory to the Court to sufficiently defend their failure to pay Plaintiff his overtime wages.  In fact, Defendants concede that they did not rely on counsel when they decided against paying the one and one-half times his regular rate for overtime. (Trial Tr. [37], 10:12-16; Trial Tr. [38], 37:3-25, 38:1.)  Instead, Defendants relied on their own opinion regarding whether to pay Plaintiff the additional compensation, failing to pay attention to legal precedent or to any recommendation from the U.S. Department of Labor regarding the issue of overtime compensation. (*Id*.)  It does not appear that Defendants looked into statutes to ensure they were abiding by federal and local laws to accurately distinguish between an employee and an independent contractor.  As a result, Defendants misclassified Plaintiff as an independent contractor, rather than categorizing Plaintiff as an employee under the FLSA and DCMWA.

Defendants address Plaintiff's contention by stating that Mr. Nuyen and Mr. Dang believed they were hiring an independent contractor and that there was therefore a lack of willfulness. (Trial Tr. [37], 14:4-14.)  However, the employers' defense certainly does not amount to an affirmative showing of their attempt to ascertain what the FLSA and DCMWA require.

Accordingly, Defendants are required to pay liquidated damages in an amount equal to the unpaid overtime wages Plaintiff is entitled to receive under the FLSA and the DCMWA. Therefore, in addition to the $20,280.00 Plaintiff will receive for his unpaid overtime wages, Plaintiff is entitled to recover an additional $20,280.00 for liquidated damages.

**E.   Equitable Tolling**

**1.   Legal Standard**

Generally, equitable tolling is proper "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Norman v. United States*, 467 F.3d 773, 776 (D.C. Cir. 2006) (quoting *Irwin v. Dep't of Veterans*, 498 U.S. 89, 96 (1990)).   Moreover, tolling enables a plaintiff to "avoid the bar of the limitations period if despite all due diligence she is unable to obtain vital information bearing on the existence of her claim." *Smith-Haynie v. D.C.*, 155 F.3d 575, 579 (D.C. Cir. 1998).

Still, equitable tolling is not always appropriate.   Equitable tolling is a "rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." *Wallace v. Kato*, 549 U.S. 384, 396 (2007).   Further, the plaintiff would need to show that "he has been pursuing his rights diligently" and that an "extraordinary circumstance" prevented him from bringing a claim sooner. *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotation marks omitted).

The Court has sole discretion for whether to apply equitable tolling. *See Smith v. Holder*, 806 F. Supp. 2d 59, 63 (D.D.C. 2011).   After all, "[t]he doctrine of equitable tolling is animated—not surprisingly—by concerns of equity, and . . . entitlement to it rests solely within the discretion of the Court." *Ayala*, 79 F. Supp. 3d at 291.

**2.   Analysis**

Plaintiff argues that its claims should be tolled to the beginning of his employment in 2008. (Trial Tr. [37], 10:19-22.)   In asking the Court for equitable tolling, Plaintiff refers to "the

*Ayala* factors"[7] and contends that Defendants' failure to post notices about overtime laws and protections prevented Plaintiff from becoming aware of his right to receive overtime compensation. (Trial Tr. [37], 10:19-25, 11:1-23, 29:8-25, 30:1-8.)  Plaintiff further contends that Mr. Nuyen's failure to inform Plaintiff about his right to overtime compensation is the sort of misrepresentation that amounts to Plaintiff's claims getting tolled to the beginning of his employment. (Trial Tr. [37], 11:10-14, 29:23-25, 30:1-5.)

However, the undersigned believes Plaintiff's understanding of *Ayala* is incomplete. Although *Ayala* discusses a defendant's failure to post notices, the Court in that case also states that "the D.C. Circuit, it appears, has not determined whether a failure to post entitles a late-filing plaintiff to tolling." *Ayala*, 82 F. Supp. 3d at 290.  Further, the Court determined that it "need not, and likely should not, establish a *per se* rule regarding the effect of a failure to post FLSA notices." *Id*. at 291.  Instead, *Ayala* held that "[t]he wisest approach to the question [of equitable tolling] is to look case by case." *Id*.

Here, the Court acknowledges that Defendants did not post any notices or posters about laws relating to overtime compensation, and Defendants admit to their failure to post. (Trial Tr. [37], 29:8-16; Trial Tr. [38], 38:21-25, 40:1-12.)  Still, the lack of notices in the workplace is not necessarily enough to establish a basis for this Court to toll Plaintiff's claims to the beginning of his employment. *See Ayala*, 82 F. Supp. 3d at 291 (finding that "entitlement to equitable tolling will depend on more than Defendants' alleged failure to post FLSA notices.").

---

[7] During the bench trial, Plaintiff argued that "the *Ayala* factors," in terms of whether or not the Court should award equitable tolling, "speak to whether or not notice was given, notices were posted at the place of employment." (Trial Tr. [37], 11:1-5.)  Plaintiff's counsel further states that *Ayala* also "instructs to look to other misrepresentations." (Trial Tr. [37], 11:10-14.)

Instead, the Court must look at "[t]he entire course of dealings" as being relevant to the question of whether equitable tolling is appropriate in this matter. *Id.* In Plaintiff's case, despite Defendants' failure to post notices, it is not clear whether Defendants' failure amounts to a larger misrepresentation when looking at the context of the complete exchange between Plaintiff and Defendants. *See Ayala*, 79 F. Supp. 3d at 291. Additionally, although Mr. Nuyen provided Plaintiff with inaccurate information regarding Plaintiff's right to overtime compensation, this exchange was not an "extraordinary circumstance" that prevented Plaintiff from ultimately bringing a claim against his employers. *See Holland*, 560 U.S. at 649.

Since the D.C. Circuit has not created a *per se* rule in how to apply equitable tolling, the Court refers to case law from other circuits. In the Second Circuit, courts award equitable tolling when the plaintiff "(1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (quoting *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002) (internal quotation marks omitted). In contrast, the Fourth Circuit has held that "tolling based on lack of notice continues until the claimant retains an attorney or obtains actual knowledge of her rights." *Cruz v. Maypa*, 773 F.3d 138, 147 (4th Cir. 2014) (citing *Vance v. Whirlpool Corp.*, 716 F.2d 1010, 1013 (4th Cir. 1983)).

Even though circuits are split as to when to apply equitable tolling, the facts in the instant case do not satisfy the Fourth Circuit's or Second Circuit's tests. In looking to the Fourth Circuit, the undersigned finds that some of Plaintiff's timeline of events is unclear. Specifically, it is not clear when Plaintiff retained an attorney, nor is it clear when Plaintiff learned of his right to receive overtime compensation. Moreover, under the Second Circuit, Plaintiff's case does not

27

satisfy the second prong, as the undersigned is not convinced that his employer telling him he was not entitled to overtime amounted to an extraordinary circumstance. Even if Mr. Nuyen's comments were misrepresentations, they were not so egregious as to prevent Plaintiff from bringing suit against Defendants for unpaid overtime wages. *See Beale*, 789 F.Supp. at 1176.

Without more records or more of a paper trail, Plaintiff's claim is too speculative. The Court cannot be certain whether Defendants' words and failure to post notices are an extraordinary or uncommon circumstance to award the remedy of equitable tolling. Accordingly, the undersigned will not apply equitable tolling to Plaintiff's claims.

### F.   Reasonable Attorney's Fees

#### 1.   Legal Standard

Under the FLSA, a court "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and the costs of the action." 29 U.S.C. § 216(b).  The DCMWA similarly provides for an award of reasonable attorney's fees to the prevailing plaintiff. D.C. Code §§ 32–1012(c), 32–1308(b).  Under the FLSA, an award of attorney's fees to the prevailing party is mandatory. *See Driscoll v. George Washington Univ.*, 55 F. Supp. 3d 106, 112 (D.D.C. 2014) (explaining the purpose of the "mandatory fee-shifting scheme" under the FLSA).

#### 2.   Analysis

Since the Court is awarding Plaintiff his unpaid overtime wages pursuant to the FLSA and the DCMWA, Plaintiff is the prevailing party in this case.  Accordingly, Plaintiff is entitled to an award of reasonably attorney's fees. *See Ayala*, 82 F. Supp. 3d at 288 ("As the prevailing party in their FLSA and DCWPCL claims, the Court finds that they are entitled to such an award

in an amount to be determined.")  Plaintiff is instructed to file a fee petition to determine a reasonable amount for attorney's fees.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the Court finds Defendants violated the Federal Fair Labor Standards Act and the D.C. Minimum Wage Act Revision Act by failing to pay Plaintiff his overtime wages.  Defendants are thus ordered to pay Plaintiff $20,280.00 in damages for unpaid overtime wages, liquidated damages in an amount equal to Plaintiff's award for unpaid overtime wages, and reasonable attorney's fees. Final judgment will be entered for Plaintiff.  The Court instructs Plaintiff to file a fee petition to determine the amount for attorney's fees.


Date:___12/30/2016_____                    _____/s/_____

                                                 ALAN KAY
                                                 UNITED STATES MAGISTRATE JUDGE